# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOSEPH BRINKMANN**, both in his individual capacity and as a collective action on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br> v.<br><br>**ABM ONSITE SERVICES – WEST, INC.**,<br><br>        Defendant. | Case No. 3:17-cv-275-SI (Lead Case); 3:17-cv-478-SI (Consolidated Case)<br><br>**OPINION AND ORDER** |

Jon M. Egan, JON M. EGAN, PC, 547 Fifth Street, Lake Oswego, OR 97034. Of Attorneys for Plaintiffs.

Jennifer K. Sheffield and Kelly M. Lipscomb, LANE POWELL, PC (SEATTLE), 1420 Fifth Avenue, Suite 4200, Seattle, WA 98111; and David G. Hosenpud, LANE POWELL, PC, 601 SW Second Street, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

This is a hybrid collective and class action lawsuit brought by Lead Plaintiff Joseph

Brinkmann (Lead Plaintiff or Class Representative) individually and on behalf of all others

similarly situated (the Class and Collective, or, collectively, C&C[1]) for alleged violations of the

---

[1] Throughout this Opinion and Order, the Court uses the term "C&C" to refer to both the FLSA collective (the Collective) and the Rule 23 wage-and-hour class (the Class).

Fair Labor Standards Act (FLSA) and Oregon wage-and-hour laws against Defendant ABM

Onsite Services – West, Inc. (ABM). Plaintiff and the C&C are represented by Jon M. Egan

(Class Counsel). Lead Plaintiff alleges that ABM failed to pay him and the C&C members on

pay day, failed to pay all earned and unearned wages upon termination, and incorrectly deducted

Oregon Workers' Benefit Fund assessments from wages for vacation, sick time, and holiday pay

hours. Before the Court is the parties' Joint Motion for Final Class and Collective Settlement

Approval (the Settlement Motion), ECF 81, and Class Counsel's Motion for Award of Attorney

Fees and Costs, and Lead Plaintiff's Motion for Approval of Service Payment (the Fees Motion),

ECF 84 (collectively, the Motions). The Court determined that a final approval hearing was not

needed. The Court has considered the Motions and memoranda filed in support, the Revised

Amended Settlement and Release Agreement (Settlement Agreement), ECF 77, the other

documents submitted in connection with the Motions, and the files, records, and proceedings in

the above-captioned action (the Action). For the following reasons, the Court grants the

Settlement Motion and grants in part the Fees Motion.

## BACKGROUND

### A.  Procedural Background

Lead Plaintiff Joseph Brinkmann sued his former employer, ABM, alleging wage-and-

hour law violations. Lead Plaintiff filed Case No. 3:17-cv-275-SI in the District of Oregon

alleging an FLSA minimum wage claim and an FLSA overtime claim pursuant to 29 U.S.C.

§§ 206-07. ECF 1. Lead Plaintiff also filed suit in Oregon state court, alleging violations of

Oregon's wage-and-hour laws. ABM removed the case to federal court, and the case was

assigned to the undersigned judge as Case No. 3:17-cv-478-SI. The Court consolidated the two

cases.

Lead Plaintiff alleges that ABM willfully failed to properly compensate the C&C by:

- Failing to deliver paychecks when wages were due, in violation of Oregon Revised Statutes (hereinafter ORS) § 653.025 and the FLSA (29 U.S.C. § 206);

- Failing to pay for overtime work when wages were due, in violation of ORS § 653.261 and the FLSA (29 U.S.C. § 207);

- Failing to pay all earned and unearned wages, such as accrued vacation hours, within the statutory deadline for payment upon termination of employment in violation of ORS § 652.140;

- Deducting Oregon Workers' Benefit Fund assessments from pay for vacation, sick time, and holiday pay in violation of ORS § 652.610; and

- Failing to pay all wages due, in violation of ORS § 652.120.

ABM and Lead Plaintiff both moved for partial summary judgment on two legal questions related to the state law claims: (1) whether an employee may recover $200 in statutory damages under ORS § 652.615 only once or for every paycheck that the practice affected; and (2) whether the $200 in statutory damages constitutes a penalty (in which case there is a 3-year statute of limitations), or liquidated or other non-penal statutory damages (in which case there is a 6-year statute of limitations). The Court found for ABM on the first issue, holding that the $200 penalty may only be assessed once, and for Lead Plaintiff on the second, holding that the statutory damages amount is not a penalty.

On March 19, 2020, the parties jointly moved for preliminary approval of their settlement and preliminary certification of a settlement class under Rule 23 of the Federal Rules of Civil Procedure. The Court requested supplemental information from the parties because of concerns that the proposed settlement did not separate the Class and Collective and did not permit members of the Collective to opt in as required under the FLSA. On May 26, 2020, the parties filed an amended joint motion for preliminary approval of the settlement and preliminary certification of a Rule 23 settlement class and an FLSA collective action. This amended settlement addressed the Court's earlier concerns about treatment of the Collective. The Court denied the amended motion, however, on other grounds. The Court found that the terms of the

settlement agreement appeared to be fair, reasonable, and adequate. The Court found, however, that the proposed notice and objection process was not fair, reasonable, and adequate, and did not provide the best notice practicable. On June 5, 2020, the parties filed a Renewed Joint Motion to Certify the Class and Preliminarily Approve Class Settlement to correct the deficiencies that led to the Court's previous denial. The Court granted that motion.

On October 26, 2020, the parties filed a Joint Motion for Final Class and Collective Settlement Approval and Class Counsel filed a motion for attorney's fees and approval of Lead Plaintiff's incentive payment. The Court, upon review of these motions, discovered that Lead Plaintiff had not correctly stated in the Notice[2] the deadline for objecting to attorney's fees but instead listed a date for filing objections that was before the motion was filed. *See* ECF 60 (Court Order granting preliminary approval and setting the deadline for filing objections to attorney's fees after the deadline for submission of the motion for attorney's fees). On January 14, 2021, the Court ordered the parties to submit supplemental briefing addressing this issue. The parties acknowledged the error and proposed a plan of correction, including sending new notice to the C&C and providing an additional opportunity to file objections. Class Counsel also proposed paying for the cost of the supplemental notice out of the attorney's fees award instead of the funds allocated for administrative costs.

On February 20, 2021, before approving the parties' proposed plan to correct the notice and objection error, the Court requested further briefing addressing the indicia of collusion that the Court believed were present in the proposed settlement agreement. The parties provided a joint brief, arguing that the proposed settlement did not support a finding of collusion and

---

[2] Capitalized terms in this Opinion not otherwise defined have the same meaning as in the Settlement Agreement.

proposing a modification to the distribution of unawarded fees, expenses, and incentive payment. Notwithstanding their position that the settlement should be approved, the parties proposed reopening the class period and sending new notices that addressed more than the problem with the notice and objections. For the proposed reopened period, C&C members would not be required to submit a second opt-in or claim form, but would be allowed to change their status. Their more recent selection would govern. The Court agreed to reopen the class period and requested that the parties file their proposed revised forms of notice and revised amended settlement agreement. The parties complied. *See* ECF 77, 78. On March 24, 2021, the Court granted preliminary approval to the revised amended settlement, reopened the class period, and approved the class and collective notice procedure. ECF 79.

On June 28, 2021, Plaintiff filed the Motions. The Fees Motion requests an award of 25% of the total settlement fund, or $1,027,903.48,[3] for Class Counsel's fees and costs, approval of $50,000 in settlement administration costs, and approval of a $10,000 service payment to Lead Plaintiff. No C&C member submitted objections on or by the deadline of July 19, 2021. ECF 86.

On August 16, 2021, the Court ordered Class Counsel to submit additional information to support the attorney's fee request. Class Counsel had not filed *any* lodestar information, meaning information about counsel's hourly rate, hours worked, or tasks performed, with his Fees Motion. The Court requested that Class Counsel submit lodestar information by August 30, 2021. The Court also requested that Class Counsel address whether filing the Fees Motion without that information provided sufficient notice to the C&C under *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010). Class Counsel responded to the

---

[3] The Fees Motion requests $1,027,903.49, but the Court analyzes the motion as if it requests the amount specified in the Settlement Agreement, $1,027.903.48. The one-cent difference is not material.

Court's request by submitting a general summary of hours worked and arguing that because

counsel requested fees as a percentage-of-the-recovery, *no* lodestar information had to be filed.

**B. Settlement Agreement and Notice as Preliminarily Approved**

   **1. Financial Terms**

The parties agreed to a Settlement Fund (the Fund) of $4,111,613.94. The amount in the

Fund represents 100% of the potential damages available to the C&C according to the facts

alleged and Class Counsel's calculations, including prejudgment interest through the date of the

parties' mediation. The Fund is separated into three independent "pots" of money: (1) the

Guaranteed Funds ($316,495.30); (2) the Claimable Funds ($2,707,215.16); and (3) Attorney's

Fees, administration costs, and a service payment to the Lead Plaintiff ($1,087,903.48). C&C

members can receive compensation from the Guaranteed Funds and Claimable Funds, and any

amount of attorney's fees not awarded by the Court.

The Guaranteed Funds are reserved to compensate Class members for the $200 penalty

that the Court determined on summary judgment would be due to each Class member for

improper deduction of the Oregon Workers' Benefit Fund if Plaintiff succeeded on that claim, as

well as the actual amount improperly deducted (*e.g.*, someone who had been underpaid by $4 as

a result of this practice would receive a $204 payment out of the Guaranteed Funds). This

amount will be sent to each Class member who does not opt out, regardless of whether they

submit a claim or opt in to the Collective.

The $2,707,215.16 in Claimable Funds are distributed only to C&C members who file a

claim (Claimable Rule 23 Payments) and Collective members who opt in (Claimable FLSA

Payments). The Claimable FLSA Payment is $25 per Collective member and would total

$38,875 if all Collective members opted in. The full $38,875 is allocated for this portion of

Claimable Funds. Every person who opts in to the Collective will receive the full $25.

The Claimable Rule 23 Payments include penalties under Oregon law for (a) workers who worked overtime, a 30-day Overtime Penalty per ORS §§ 653.055, 652.150; and (b) workers whose employment terminated before ABM paid back the alleged over-deducted amounts, a Final Paycheck Penalty per ORS §§ 652.140, 652.150. The amount allocated for the Claimable Rule 23 Payments is $2,668,340.16, which is 71% of the total $3,756,243.64 estimated damages in this category. If claims had exceeded the amount allocated, claimants would have gotten paid on a pro rata basis. Because few enough Class members filed claim forms, however, Class members who filed claims will receive all their claimed damages. There is no need to reduce Claimable Rule 23 payments on a pro rata basis and claimants are not limited to 71% recovery.

Under the Settlement Agreement, any part of the Claimable Rule 23 Fund left is considered "Unclaimed Funds." ABM need not disburse Unclaimed Funds and is allowed to keep that money. This Unclaimed Funds provision serves to reduce the total $2.7 million allotted for Claimable Funds distribution to a far lower amount, depending on the amount of claims that are submitted.

Claimable FLSA Funds (maximum $38,875) that are unclaimed because of a failure to opt in are not treated the same. Instead, any unclaimed Claimable FLSA Funds that remain, along with any unused portion of the $50,000 allocated for settlement administration costs and any settlement checks that are not deposited or negotiated in 60 days, are designated as "Residual Funds." Residual Funds will be donated to the Northwest Workers Justice Project, a 501(c)(3) nonprofit organization dedicated to employee education and rights, as a *cy pres* distribution.

The Settlement Agreement provides that Class Counsel will petition the Court for an award of attorney's fees and costs not to exceed $1,027,903.48, which is 25% of the gross

settlement figure. The Settlement Agreement also provides that Plaintiff will petition the Court for an incentive payment not to exceed $10,000. Any portion of the fees or incentive payment not awarded by the Court is treated as "Unawarded Funds" and will be disbursed pro rata among C&C members who did not submit claims or opt in, along with their Guaranteed Payment. ABM covenanted not to challenge the amount of fees sought by Class Counsel. The parties allocated $50,000 for settlement administration expenses.

### 2.  Notification

The Court granted preliminary approval of the original proposed notice procedure after the parties made certain amendments requested by the Court. Among these amendments, the Court required the parties to amend the notice to accurately inform C&C members how and when they could object to the motion for attorney's fees and supporting documentation to comply with *In re Mercury*. For the original settlement, the Court ordered the following deadlines:

- Dissemination of the Notice and Claim Form by August 12, 2020;
- Rule 23 opt out deadline of October 12, 2020;
- Rule 23 claim form deadline of October 12, 2020;
- FLSA opt in deadline of October 12, 2020;
- Filing and posting on settlement website of Attorney's Fees Motion, October 26, 2020;
- Filing and posting on settlement website of Final Settlement Motion, October 26, 2020;
- Objection deadline of November 12, 2020;[4]
- Reply brief deadline of November 19, 2020; and
- Final hearing date of November 30, 2020.

ECF 60.

---

[4] The information provided to the Class erroneously stated this deadline as October 12, 2020.

As discussed above, because the notice as actually sent violated *In re Mercury*, and because of the Court's concerns with the indicia of collusion, the Court reopened the class period. For the reopened period, the Court approved the following deadlines:

- Dissemination of the Notice and Claim Form by April 5, 2021;
- Reminder Notice disseminated to non-responsive Class members on May 5, 2021;
- Rule 23 opt out deadline of June 7, 2021;
- Rule 23 claim form and FLSA opt-in form deadline of June 14, 2021;
- Filing and posting the Motions on settlement website on June 28, 2021;
- Objection deadline of July 19, 2021;
- Reply brief deadline of August 2, 2021; and
- Final hearing date of August 23, 2021.

ECF 79.

Settlement administration was carried out by Epiq Class Action & Claims Solutions, Inc. (Epiq), a class action administration provider. For the original period, Epiq sent notice via U.S. mail and by posting information on the dedicated settlement website. For the reopened period, Epiq carried out the procedure approved in the Court's Order granting preliminary approval of the amended revised settlement. Epiq sent notice of the settlement to C&C members via U.S. mail, SMS text message, and email. Epiq also posted the Notice, Proof of Claim form, Settlement Agreement, and the Court's Order granting preliminary approval on the settlement website. Before mailing, Epiq checked all mailing addresses against the National Change of Address database maintained by the United States Postal Service (USPS).

The Notice provided C&C members with all required information. This information included, among other things: (1) a summary of the Action and the claims asserted; (2) a definition of the Class; (3) a description of the material terms of the settlement; (4) an explanation of C&C members' opt-out, claim submission, and opt-in rights; (5) the date by

which C&C members must opt out or submit claim and opt-in forms, and information about how to do so; (6) an explanation of the release of claims should C&C members choose to remain in the Class or opt in to the Collective; (7) instructions about how to object to the Settlement and the deadline to submit any objections; (8) instructions about how to object to the requested attorney's fees, expenses, and service awards and the deadline for C&C members to submit any objections; (9) the date, time, and location of the final approval hearing; (10) the internet address for the settlement website and the telephone number from which C&C members could obtain more information on the settlement; (11) contact information for the settlement administrator and the Court; and (12) information about how Class Counsel and the Class Representative would be compensated.

On April 5, 2021, Epiq mailed the supplemental Notice and claim and opt-in forms (Claim Package) and sent email and SMS text message notices to the Class. Epiq achieved a 93.95% deliverable rate of the supplemental Claim Packages by mail. Epiq sent 183 supplemental email notices to C&C members who had a valid email address. The supplemental email notice included an embedded link to the case website. Two emails were undeliverable. Epiq sent 1,534 supplemental notices via SMS text messages to C&C members with a valid phone number. Four text messages "bounced back." Epiq also mailed a postcard notice by the same methods used to find the correct mailing address for Claim Packages.

On May 5, 2021, Epiq followed up with Class members who had not responded to the prior forms of notice. Epiq mailed 1,066 supplemental reminder postcard notices. Epiq sent 40 supplemental reminder email notices to Class members for whom Epiq had not received an opt-in or claim form and who had not opted out. Epiq sent 1,053 supplemental reminder notices via SMS text messages to C&C members with a valid phone number who had not yet completed an

opt-in or claim form or had not opted out. Seven messages "bounced back" from the reminder text. In sum, between USPS mail, email, and text message, Epiq was able to successfully contact addresses associated with every C&C member.

David G. Hosenpud, counsel for ABM, complied with the requirements of the Class Action Fairness Act and sent letters giving notice of the proposed Settlement to the United States Attorney General and the State Attorneys General for all states in which putative class members reside. Initial notice was provided on March 23, 2020, and updates were sent on June 1, 2020, and April 1, 2021. No attorney general has submitted an objection.

### 3. Responses

The Court's Order preliminarily approving the Settlement ordered that all claim forms and opt out requests in the reopened period must be submitted through the website or postmarked by June 14, 2021. As of June 24, 2021, Epiq received 11 timely and potentially valid opt-out requests, and 703 claim forms and opt-in forms. Of the 703 claim forms, 156 were duplicative of another claim, eight were denied as submitted by someone not on the Class list, seven were denied as incomplete, one claim was denied because "none of the submitted information matched the original Class List data," and one claim was denied because the Class member also submitted an opt-out request. A total of 530, therefore, were deemed timely and complete. This number includes claim forms timely submitted during the original claims period.

Class members claimed $1,418,819.58 in Claimable Funds, which is 52.4% of the $2,707,215.16 allocated. Of that total, $13,250 was Claimable FLSA Funds (maximum $38,875) and $1,405,569.58 was Claimable Rule 23 Funds (maximum $2,668,340.16). This means that $25,625 in unclaimed FLSA Funds will be treated as Residual Funds and donated to the *cy pres* recipient, Northwest Worker's Justice Project. This also means that $1,262,770.58 in unclaimed Claimable Rule 23 Funds will not be distributed and will stay with ABM as Unclaimed Funds (in

essence, revert to ABM). Class Members will receive Total Guaranteed Payments in the amount

of $314,066.96. That leaves $2,428.34 in unclaimed Guaranteed Funds that will go to the *cy pres*

recipient (for the 11 C&C members who opted out). In sum, ABM will pay out $1,732,886.54 to

the C&C, and $1,760,939.88 total (excluding the amount allocated for attorney's fees and other

costs). Including the amount allocated for attorney's fees, claims administrator, and service

award ($1,087,903.48)—for which any amount unawarded will be distributed to the *cy pres*

recipient or C&C members, depending on the category—ABM's total payout is $2,848,843.36.

## DISCUSSION

The Court must evaluate whether the Class should be certified, whether the Collective

should be certified, and whether the settlement itself meets the Ninth Circuit's requirements.

Although the Class and the Collective are the same group, the validity of each depends on

different factors and is evaluated separately. The Court also must consider the requested

attorney's fees, incentive award, and administrative costs.

## A. Class Certification

### 1. General Standards

To certify either a settlement class or a litigation class, the requirements of Rule 23 of the

Federal Rules of Civil Procedure must be satisfied. *See Hanlon v. Chrysler Corp.*, 150 F.3d

1011, 1019 (9th Cir. 1998). Class actions are governed by Rule 23 of the Federal Rules of Civil

Procedure. Under Rule 23, the plaintiff "must be prepared to prove" that each of the

requirements of the Rule is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23 sets forth more than a "mere pleading standard." *Id.* On the other hand, Rule 23 provides

district courts with broader discretion to certify a class than to deny certification. *See Abdullah v.*

*U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013).

A party seeking class certification must satisfy each of the requirements of Rule 23(a)

and at least one requirement of Rule 23(b). *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542

(9th Cir. 2013). Under Rule 23(a), a district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law and fact common to
> the class; (3) the claims or defenses of the representative parties
> are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a). In other words, a proposed class must meet the requirements of

numerosity, commonality, typicality, and adequacy of representation. *Mazza v. Am. Honda*

*Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). On top of the five requirements of

Rule 23(a), the party seeking to maintain a class action also must "satisfy through evidentiary

proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33

(2013).

The Rule 23 analysis is "rigorous" and may "entail some overlap with the merits of the

plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351 (quotation marks omitted); *see also*

*Comcast Corp.*, 569 U.S. at 33-34. Nevertheless, Rule 23 "grants courts no license to engage in

free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr.*

*Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only

to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class

certification are satisfied." *Id.* A district court, however, "*must* consider the merits if they overlap

with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th

Cir. 2011) (emphasis in original).

"The criteria for class certification are applied differently in litigation classes and

settlement classes." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en

banc). In considering a litigation class, the court "must be concerned with manageability at trial," whereas in considering a settlement class, "such manageability is not a concern . . . [because], by definition, there will be no trial." *Id.* at 556-57. "On the other hand, in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses." *Id.* at 557. This will "demand undiluted, even heightened, attention in the settlement context" because the court "will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention[.]" (simplified)). Plaintiff and ABM jointly argue that the Class meets all the requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3).

### 2. Numerosity

Rule 23(a)(1) requires plaintiffs to show that the proposed class "is so numerous that joinder of all members is impracticable." Rule 23(a)(1) provides no bright-line test or minimum number of class members necessary to meet the numerosity requirement; instead, the court must evaluate the specific facts of each case. *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). In general, classes of 20 members or fewer are too small, classes of 21 to 40 members may or may not be sufficiently numerous, depending on the facts of the case, and classes of 41 and higher are sufficiently numerous. *See* 5 *Moore's Federal Practice-Civil*, § 23.22[1][b] (2021). In this district, there is a "rough rule of thumb" that more than 40 class members meets the numerosity requirement. *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D. Or. 2013); *see also Wilcox Dev. Co. v. First Interstate Bank of Or., N.A.*, 97 F.R.D. 440, 443 (D. Or. 1983) (same); 1 *McLaughlin on Class Actions*, § 4:5 (17th ed.) ("The

rule of thumb adopted by most courts is that proposed classes in excess of 40 generally satisfy the numerosity requirement."); 5 *Moore's Federal Practice-Civil*, § 23.22[1][b] ("A class of 41 or more is usually sufficiently numerous. Once again, many courts have ruled that classes with more than 40 members satisfy the numerosity requirement."). The Class consists of 1,555 members. This number far exceeds the 41-member benchmark and meets the numerosity requirement.

### 3.  Commonality

Rule 23(a)(2) states that class certification is appropriate only when the case presents "questions of law or fact common to the class." To satisfy the commonality requirement, a plaintiff must show that the class members suffered the "same injury"—that their claims depend on a "common contention." *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* But class members need not have *every* issue in common: Commonality requires only "a single significant question of law or fact" in common. *Mazza*, 666 F.3d at 589; *see also Wal-Mart*, 564 U.S. at 359. "These common questions may center on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies.'" *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (alteration in original) (quoting *Hanlon*, 150 F.3d at 1019).

The alleged harm is that all purported Class members were not paid regular and overtime wages on time, that improper deductions were taken, and that some wages were not paid. There are many common issues of law and fact stemming from these allegations, including whether deduction of Oregon Workers' Benefit Fund assessments for paid but non-worked hours violates Oregon law, whether the overtime claims are viable under competing statutory interpretations,

whether the time for which class members were not compensated is *de minimis*, whether ABM has legally viable defenses to application of Oregon's wage-and-hour laws, and whether ABM's actions were willful. The Court finds that the commonality requirement is met because these legal issues are shared by all class members.

### 4. Typicality

To meet the typicality requirement, a plaintiff must show that the named parties' claims or defenses are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Under the "permissive standards" of Rule 23(a)(3), the "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). To determine whether claims and defenses are typical, courts look to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (quotation marks omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). The claims of the Class Representative are based on the same conduct as the claims of the Class. The claims for relief described in the Consolidated Administrative Complaint consistently refer to both Lead Plaintiff and the Class and there is nothing to suggest that Lead Plaintiff's claims are not co-extensive with the Class. The Class Representative has the same injury as the Class members, and his claims are typical of the class he seeks to represent.

### 5. Class Representative and Class Counsel's Adequacy

Rule 23(a)(4) states that before a class can be certified, a court must find that "the representative parties will fairly and adequately protect the interests of the class." This

requirement turns on two questions: (1) whether "the named plaintiffs and their counsel have any conflicts of interest with other class members"; and (2) whether "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class[.]" *Hanlon*, 150 F.3d at 1020. The adequacy requirement is based on principles of constitutional due process; accordingly, a court cannot bind absent class members if class representation is inadequate. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940); *Hanlon*, 150 F.3d at 1020. The Class Representative does not have any conflict of interest with the Class and, along with Class Counsel, has prosecuted this action for the last three years, including filing and arguing a motion to compel, responding to a motion for partial summary judgment, and cross-moving for partial summary judgment. Thus, the Court finds that the Class Representative and Class Counsel are adequate to represent the Class.

### 6.  Predominance

Rule 23(b)(3) requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This analysis, in accord with "[a] principal purpose" of Rule 23 in "promot[ing] efficiency and economy of litigation . . . focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah*, 731 F.3d at 963-64 (quotation marks omitted). The focus of this inquiry, however, is on "*questions* common to the class"—plaintiffs need not, at this threshold, "prove that the predominating question[s] will be answered in their favor." *Amgen*, 568 U.S. at 459, 468 (emphasis in original). There is "substantial overlap" between the test for commonality under Rule 23(a)(2) and the predominance test under 23(b)(3), but the predominance test is "far more demanding." *Amchem*, 521 U.S. at 624. To determine

whether common questions predominate, the Court begins with "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

Questions common to the class predominate in this case. For both the Oregon wage-and-hour claims and the FLSA claims, legal liability turns on whether ABM's patterns and practices themselves were wrongful, not on individual-specific legal questions. These predominant questions include: (1) whether the Oregon Workers' Benefit Fund assessment should be withheld from certain types of pay but not others; (2) what ABM's pay day was and whether its policies and procedures resulted in paying workers a minimum wage on pay day; (3) whether ABM's policies and procedures caused failure to timely pay terminated employees for all earned and unearned wages; (4) whether any violation was willful; and (5) what remedies are available for any violations.

"Rule 23(b)(3)'s predominance requirement takes into account questions of damages." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). As the Ninth Circuit has explained, however:

> To satisfy this requirement, plaintiffs must show that damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory. However, damage calculations alone cannot defeat certification. The presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3). . . . To gain class certification, Plaintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical.

*Id.* (quotation marks omitted). Although Plaintiffs may have an individualized amount of damages, the whole Class suffered damages traceable to the same alleged conduct by ABM. Thus, Plaintiffs have shown predominance.

### 7. Superiority

Rule 23(b)(3)'s superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). To make this determination, a court looks to "whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. In turn, this inquiry "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.* The Ninth Circuit recognizes that "[d]istrict courts are in the best position to consider the most fair and efficient procedure for conducting any given litigation, and so must be given wide discretion to evaluate superiority." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (simplified). Relating to superiority, a purpose of Rule 23(b)(3) is "to allow integration of numerous small individual claims into a single powerful unit." *Id.* at 722 (quoting *Blackie v. Barrack*, 524 F.3d 891, 899 (9th Cir. 1975)). This allows plaintiffs that otherwise likely would be "unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover . . . 'to pool claims which would be uneconomical to litigate individually.'" *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985)).

Rule 23(b)(3) provides four non-exhaustive factors for courts to consider. These factors are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

As to the first factor, "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin*, 617 F.3d at 1175. The amount at stake for putative Class members is small relative to the cost of litigating individual claims. For example, the payout for many claims provided to the Court by the Epiq are for around $350, many are for around $5,000 to $8,000, and a small number approach $20,000. Thus, "[b]ecause individual damages pale in comparison to the costs of litigation, this factor points toward certification." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 316 (N.D. Cal. 2018).

As to the second factor, no other similar litigation has been commenced and this factor supports certification. As for the third factor, concentrating this litigation in the District of Oregon is appropriate, as the Class itself is exclusive to workers in Oregon, ABM does business in Oregon, and the District Court is well situated to hear both the federal FLSA claims and the state wage-and-hour claims.

The fourth factor requires courts to consider the likely difficulties in managing a class action. There is, however, a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)). The Court finds any manageability concerns to be minimal because the Class is readily identifiable and contacted through payroll records and the Class consists of 1,555 people.

The parties argue in the Settlement Motion that the class is "ascertainable." That is a factor that courts in the Ninth Circuit, including this District, previously had considered in analyzing class certification. The Ninth Circuit, however, clarified that ascertainability, often used to refer to the administrative feasibility of identifying class members, is not a freestanding

requirement for class certification. *See Briseno*, 844 F.3d at 1125-28, n.3-4. Instead, the court

explained in *Briseno* that any concerns about the identification of class members could be

handled through evaluating superiority and considering the likely difficulties in managing a class

action. *Id.* at 1127-28. As the parties have stated, identifying and contacting Class members is

straightforward because ABM has personnel records that can identify Class members.

### 8.  Conclusion

The Court certifies for settlement purposes only the following class: all current and

former ABM employees who received a paycheck for work performed in Oregon on or after

February 16, 2011 and on or before April 15, 2017, who do not file a timely request to opt out of

the Class.

## B.  Collective Certification

The FLSA requires that a collective consist of members who are "similarly situated" and

limits participation in the collective to those who opt in. 29 U.S.C. § 216(b). The FLSA does not

define "similarly situated." Under Ninth Circuit precedent, an FLSA collective is similarly

situated when the plaintiffs are alike in ways that are material to the disposition of their FLSA

claims. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114 (9th Cir. 2018). This standard is

less rigorous than Rule 23's class certification requirements and does not include factors such as

adequacy, superiority, and predominance, which have no foundation in the text of section 216(b).

*Id.* at 1115.

The Collective members are similarly situated under the FLSA. The Collective members

were all employed by ABM while the disputed pay practices were in use and received paychecks

that were allegedly illegally calculated. Thus, they are alike in a way that is material to the

disposition of the FLSA claims.

The Court certifies for settlement purposes only the following FLSA collective: all current and former ABM employees who received a paycheck for work performed in Oregon on or after February 16, 2011 and on or before April 15, 2017, who timely opt in to the Collective.

## C. Settlement Approval

### 1. General Standards

Under Rule 23(e) of the Federal Rules of Civil Procedure, "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Thus, to approve a class action settlement, a court must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(3); *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012).

The settlement must be considered as a whole, and although there are "strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane*, 696 F.3d at 818-19 (quoting *Hanlon*, 150 F.3d at 1027). A court must consider whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). The Ninth Circuit has articulated several factors guiding this review, including: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class

members to the proposed settlement. *Lane*, 696 F.3d at 819. Courts within the Ninth Circuit "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

Class action settlements involve "unique due process concerns for absent class members who are bound by the court's judgments." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1168 (9th Cir. 2013) (quotation marks omitted). When the settlement agreement is negotiated before formal class certification, the court should engage in "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *Id*. (quotation marks omitted). This more "exacting review" is warranted "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819 (quotation marks omitted).

The Ninth Circuit has recognized, however, that "[j]udicial review also takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Thus, there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Hyundai*, 926 F.3d at 556 (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)).

### 2. Strength of Plaintiffs' Case; Risk, Expense, Complexity, and Likely Duration of Further Litigation; and Risk of Maintaining Class Action Status Throughout the Trial

The legal arguments of the Class has some strengths and some weaknesses. As the Court found on summary judgment, ABM could be liable for statutory damages of $200 per Class member for the allegedly improper deduction of the Oregon Workers' Benefit Fund. The Class has a good case that some of the alleged practices were unlawful. Plaintiffs, however, are

vulnerable on the question of willfulness, on some of their legal claims, and on the low actual damages allegedly suffered by each Class member. Given both sides' uncertainty of outcome, this factor favors approval of the Settlement Agreement.

The expense of further litigation also supports settlement approval. The parties agree that, had they not settled, they would have engaged in significant additional discovery and would have litigated a motion for conditional certification of the Collective, a motion for certification of the Class, additional cross-motions on summary judgment, and motions to decertify the Collective and Class had they been certified. These motions and the related litigation would have been complex and costly, while providing less certain relief to the C&C. Further, class certification had not begun, and both sides bore the risk that a class would or would not be certified. The parties also would have faced the expense and risk of a trial, and possible appeal. Given the high cost, the risk to the parties, and the added burden on the judiciary without a settlement, these factors support approval of the Settlement.

### 3. Amount Offered in Settlement[5]

In considering the potential fairness of the recovery, courts often compare the total amount of recovery in a settlement to the estimated total amount of damages that could be recovered if the case was litigated. *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). Nonetheless, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (quoting *Officers for Just. v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)).

---

[5] Although not part of the Settlement, the Court notes that in response to the lawsuit, ABM has changed its payroll processes so that Oregon Workers' Benefit Fund assessments will no longer be deducted from employee wages for non-worked hours.

As detailed above, the Settlement provides a Guaranteed Payment and two Claimable Payments. The Guaranteed Payment and Claimable FLSA Payment are funded in the Settlement Agreement at 100% of estimated damages. Unclaimed FLSA Funds in the amount of $25,625 will be treated as Residual Funds. The Settlement Agreement provides for initial use of these funds to compensate the Class Administrator for expenses above $50,000, if any, and then for the remainder to be donated to the Northwest Workers' Justice Project, the *cy pres* recipient. The Class Administrator confirmed in the Declaration of Les Chappell that the costs for all current and future administrative services will not exceed $50,000. ECF 75 at 3. The Claimable Rule 23 Payment is funded at 71% of estimated damages. Because only a minority of Class members filed a claim, Claimable Rule 23 Payments will not need to be reduced and will be paid in full to each claimant. ABM will retain $1,262,770.58 in unclaimed Claimable Rule 23 Funds.

The Court recognizes that the nature of a settlement is that in avoidance of the uncertainties and costs of trial, each party may accept an outcome that is less than their ideal. *See Ontiveros v. Zamora*, 303 F.R.D. 356, 370-71 (E.D. Cal. 2014) (approving a wage and hour settlement of about $1 million, when total damages amounted to $3 to $4 million). Class Counsel negotiated a settlement that guarantees payment of around $200 to every Class member regardless of whether a claim is submitted. The settlement also guarantees payment of $25 to every member of the Collective who opts in. Finally, the settlement includes at least 71% of the estimated damages for claims for Class members who submit claims, absent an overwhelming response from the Class requiring a pro rata discount from Claimable Rule 23 Funds. For an average claim submission rate, the members of the Class could expect to receive 100% of their estimated damages (which is what actually occurred). Thus, this factor supports approval of the Settlement.

### 4.  Extent of Discovery Completed and the Stage of The Proceedings

This factor is concerned with whether "the parties have sufficient information to make an informed decision about settlement." *In re Mego*, 213 F.3d at 459 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)). At the time the parties jointly moved for settlement approval, the case had been litigated for three years. The parties engaged in significant discovery, including both formal and informal written discovery, exchanging 53,000 pages of time and pay records for more than 1,500 employees, and exchanging large amounts of information and multiple rounds of explaining and refining calculations to reach the appropriate damage figures. Because the parties had significant information and the Settlement was reached through careful investigation, this factor supports approval of the Settlement.

### 5.  Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). While counsel's views are instructive, they do not entitle the settlement to a presumption of fairness. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019).

Class Counsel has more than 16 years of experience specializing as a wage and hour collective and class action litigator. He helped draft an Oregon state wage and hour law, as well as Oregon uniform jury instructions on wage and hour claims. Although he made some significant errors, particularly with respect to the federal law applicable in this case, the Court is satisfied that his experience has allowed Class Counsel to evaluate the merits of the claims and risks associated with prosecuting the claims through trial and appeal. ABM's counsel also is experienced. The Court accordingly credits counsels' determination that the settlement is fair and reasonable and finds that this factor favors final approval.

### 6.   Presence of a Governmental Participant

The Class Action Fairness Act (CAFA) provides in relevant part:

> Not later than 10 days after a proposed settlement of a class action
> is filed in court, each defendant ... shall serve upon the appropriate
> State official of each State in which a class member resides and the
> appropriate Federal official, a notice of the proposed settlement[.]

> *  *  *

> An order giving final approval of a proposed settlement may not be
> issued earlier than 90 days after the later of the dates on which the
> appropriate Federal official and the appropriate State official are
> served with the notice required under subsection (b).

28 U.S.C. § 1715(b), (d). ABM provided the notices required under CAFA to the U.S. Attorney

General and the state Attorneys General of Arizona, Arkansas, California, Colorado, Florida,

Idaho, Indiana, Illinois, Michigan, Missouri, Nevada, North Carolina, Oregon, Pennsylvania,

South Carolina, Virginia, Washington, and Wisconsin. ABM's counsel sent initial notice on

March 23, 2020, four days after the first motion for preliminary approval of the settlement was

filed. ABM's counsel timely sent supplemental notices on June 1, 2020 and June 15, 2020, after

the revised and amended revised motions for preliminary settlement approval were filed. On

April 1, 2021, ABM's counsel sent a fourth notice to the United States Attorney General and the

relevant state Attorneys General providing updated information regarding the reopened class

period. More than 90 days have elapsed since all of the notices were sent and no Attorney

General has objected to the proposed settlement or otherwise become involved in the case. This

factor therefore supports approval of the settlement.

### 7.   Reaction of the Class Members to the Proposed Settlement

No Class members have objected to the proposed settlement, and eleven Class members

have opted out. The low rate of opt-outs and the lack of objections show that Class members

favor the Settlement. Thus, this factor ultimately supports approval.

### 8.  Absence of Collusion or Other Conflicts of Interest

When the settlement agreement is negotiated before formal class certification, as in this case, the court should engage in "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Because collusion is not always evident on the face of a settlement, the Ninth Circuit has identified subtle signs of collusion, including:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* at 947 (simplified). The third factor, reversion, is also examined with respect to "unclaimed portions of a settlement fund." *In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 611 (9th Cir. 2018).

### a.  Disproportionate Attorney's Fees

First, the Court examines whether Class Counsel has sought a disproportionate distribution of the settlement. The Settlement Agreement provides for Class Counsel's request of $1,027,903.48 in attorney's fees, which is 25% of the overall $4.11 million settlement fund. In considering the collusion factors, however, "the amount of attorneys' fees is measured against the class's actual payout from the fund, rather than the full amount." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015) (collecting cases); *see also In re Bluetooth*, 654 F.3d at 947 (stating that a subtle sign of collusion is "when counsel receives a

disproportionate *distribution* of the settlement" (emphasis added)). Further, as detailed above, the

parties negotiated a segregated, capped fund of about $3.02 million for distribution to the class,

and reserved the remainder for award to Class Counsel, administrative expenses, and a service

fee for the Class Representative. "Under regular common fund procedure, the parties settle for

the total amount of the common fund and shift the fund to the court's supervision. The plaintiffs'

lawyers then apply to the court for a fee award from the fund." *Staton*, 327 F.3d at 969. The

parties did not follow this convention, instead limiting the amount available to the Class before

bringing the Settlement to this Court.

Comparing the requested fees with the amount the C&C will receive ($1,732,886.54), the

requested fees are 59.32%.[6] This is a higher percentage, but all Class members who submitted

claims have been made whole, receiving their full amount of damages. Class members who did

not submit claims still receive a fairly substantial award of $200 plus their actual losses from

ABM's improper deduction of the Oregon Workers' Benefit Fund. *See Norris v. Mazzola*, 2017

WL 6493091, *9 (N.D. Cal. Dec. 19, 2017) (finding that this factor did not suggest collusion

when requested fees were 25% of the common fund and amounted to 44% of the plaintiffs' total

---

[6] Plaintiff's counsel argues that the Court should include the amount of attorney's fees, claims administrator costs, and incentive award as a "constructive common fund" in comparing the payout to the class to attorney's fees, citing *In re Bluetooth*. That case, however, involved injunctive relief as the primary benefit to the class, and so the Ninth Circuit discussed that upon remand the district court may elect to use the total dollar amount the defendant was willing to pay in cash for those expenses as a "constructive common fund" in evaluating this factor for collusion. *In re Bluetooth*, 654 F.3d at 943, 945. Here, the Court does not need to create a "constructive common fund" because the Settlement establishes a cash settlement fund for the benefit of the Class. The Court simply compares the amount being paid to the Class to the amount requested for attorney's fees, "after making the deductions for attorneys' fees, costs, the named Plaintiff's incentive award and enhancement, and the fee for the settlement administrator." *Bellinghausen*, 306 F.R.D. at 258.

settlement value and where claimants were "made whole" and received additional benefit beyond what they might have received at trial).

### b. Clear Sailing Arrangements

Second, the Court looks at whether the parties have negotiated a "clear sailing" arrangement that provides for the payment of attorney's fees separate from class funds. A settlement agreement that includes a covenant not to object to attorney's fees is a form of a clear sailing arrangement and shows that counsel may have "bargained away something of value to the class." *Roes, 1-2, LLC*, 944 F.3d at 1050-51; *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1127 (9th Cir. 2020) ("The concern with a 'clear sailing' arrangement is that class counsel may have obtained too little for the class 'in exchange for red-carpet treatment on fees.'" (quoting *In re Bluetooth*, 654 F.3d at 947)).

The parties acknowledge that the Settlement contains a clear sailing provision. ABM has covenanted not to challenge Class Counsel's Fees Motion so long as it does not exceed the $1,027,903.48 limit established in the Settlement Agreement. Although this indicator of collusion is present, the Settlement itself does not suggest that Class Counsel sacrificed value on behalf of the Class in exchange for "red-carpet treatment" on fees. The $3.02 million designated for payment to the Class represents about 74%[7] of the total amount that Class members would receive under full recovery. As discussed above, given the balancing inherent in a class action settlement, this amount is sufficient and it does not appear that Class Counsel bargained away anything of value that the Class would have otherwise received.

---

[7] The entire Settlement Fund represents complete recovery for the class. The Claimable and Guaranteed Funds together total $3,023,710.46, which is 73.54% of $4,111,613.94.

### c. Reversion

A reversion clause transfers unclaimed settlements funds, including unclaimed attorney's fees, back to the defendant. *In re Volkswagen*, 895 F.3d at 611-12. This can benefit both defendants and class counsel at the expense of class members by giving class counsel an inflated fund against which to base a fee motion when full participation is unlikely, and by simultaneously reducing the actual amount defendants are likely to pay out. *Id.*

That said, reversion clauses can have a benign purpose and "are not per se forbidden." *Id.* at 612. It is not uncommon for hybrid wage-and-hour class actions and FLSA collectives, which pay claims calculated on an individual basis to compensate for the alleged violations rather than evenly distributing a fund to the class, to include a reversion. *See Glass v. UBS Fin. Servs., Inc.*, 331 F. App'x 452, 456 (9th Cir. 2009) (affirming the district court's approval of a wage-and-hour settlement containing a reversion of unawarded attorney's fees because the settlement itself achieved exceptional results for the class); *Trout v. Meggitt-USA Servs., Inc.*, 2018 WL 1870388, at *6 (C.D. Cal. Apr. 17, 2018) (approving reversion in a hybrid case where claimants received their amount of actual and liquidated damages because redistributing unpaid funds to employees who submitted claims would result in those class members being compensated well above the full value of their claim).

The Settlement Agreement allows ABM to retain any unclaimed Claimable Rule 23 Funds to ABM, which is in essence a reversion. The nature of the claims in this case, which can be precisely calculated, suggest that a fair form of compensation is payment of statutory damages and actual damages, rather than an equal distribution of the fund. The Settlement's structure guarantees between 71 and 100% recovery to each Class member on their Claimable Rule 23 Funds, and guarantees 100% recovery of the Guaranteed Payment and the Claimable FLSA Payment. The reversion of unclaimed funds, therefore, does not suggest collusion.

In response to the Court's concern about the indicia of collusion, the parties revised the Settlement to re-direct any unawarded attorney's fees to Class members who did not opt in. This pool of money is designated as "Unawarded Funds" and this amount will be distributed pro rata among Class members who did not submit claims. Any amount of the Unawarded Funds that cannot be distributed to Class members shall be designated as "Residual Funds" and given to the *cy pres* recipient. This restructure further supports that the Settlement is not the product of collusion.

### d.  Conclusion

The subtle signs of collusion are present in the Settlement Agreement. The requested attorney's fees are somewhat high relative to the payout to the C&C, the settlement contains a clear sailing arrangement, and there remains a partial reversion where the unclaimed Claimable Funds stay with ABM. The Court has considered, however, that the Settlement was reached after negotiation with a neutral mediator and that the benefit to the Class is significant. Even assuming there had been a 100% claim rate, a near impossibility, Class members would have received full FLSA and Guaranteed Payment compensation and 71% of their actual Rule 23 claim losses. Assuming a more realistic claim rate, as was realized, Class members received the full value of all of their estimated losses. There is little risk, therefore, that Class Counsel sacrificed value on behalf of the Class in exchange for a clear sailing agreement or a disproportionate fee award, or that Class Counsel agreed to a reversion to the detriment of Class members.

### 9.  The Settlement Should Be Approved

The above discussed factors—strength of the plaintiff's case; risk, expense, complexity, and likely duration of further litigation; risk of maintaining class action status through trial; amount offered in settlement; extent of discovery completed and stage of the proceeding; experience and views of counsel; presence of a governmental participant; reaction of the class

members—all support approval of the Settlement Agreement. Even though there are indicia of collusion present, the Settlement provides for fair compensation to the Class. The purpose of the collusion analysis is to ensure that counsel has not sacrificed a benefit to the class in exchange for personal benefit. The Court finds that, as described above, the Settlement provides sufficient benefit to the Class and Class Counsel has not enriched itself at the expense of the Class.

## D. Attorney's Fees

Requests for attorney's fees must be made by a motion pursuant to Federal Rules of Civil Procedure 54(d)(2) and 23(h), and notice of the motion must be served on all parties and class members. Fed. R. Civ. P. 23(h). When settlement is proposed along with a motion for class certification, notice to class members of the fee motion ordinarily accompanies the notice of the settlement proposal itself. Advisory Committee Notes to Fed. R. Civ. P. 23(h). The deadline for class members to object to requested fees must be set after the motion for the fees *and documents supporting the motion* have been filed. *In re Mercury*, 618 F.3d at 993-95.

In considering the amount of attorney's fees for class counsel where there is a common fund, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth*, 654 F.3d at 942. Under either method, the court must exercise its discretion to achieve a "reasonable" result. *Id*. Because reasonableness is the goal, "mechanical or formulaic application of either method, where it yields and unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) (quotation marks omitted). When using the percentage method, 25 percent is the "benchmark" fee award, with the usual range of 20-30 percent. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (citing 3 Newberg on Class Actions, § 14.03). This amount, however,

may be adjusted upward or downward when "special circumstances" warrant a departure. *In re Bluetooth*, 654 F.3d at 942.

Courts must place in the record the relevant special circumstances to depart from the benchmark fee award. *Id*. The Ninth Circuit has explained,

> In *Vizcaino*, we identified several factors courts may consider when assessing requests for attorneys' fees calculated pursuant to the percentage-of-recovery method: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; (6) and whether the case was handled on a contingency basis.
>
> *Vizcaino* did not establish an exhaustive list of factors for assessing fee requests calculated using the percentage-of-recovery method, but district courts have frequently referred to the factors it identified when considering fee awards for class counsel. Ultimately, district courts must ensure their fee awards are supported by findings that take into account all of the circumstances of the case.

*In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020) (quotation marks and citations omitted); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015) (noting that the *Vizcaino* factors "include the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis" and that in addition, "a court may cross-check its percentage-of-recovery figure against a lodestar calculation" (quotation marks omitted)).

As a preliminary matter, the Court considers whether Class Counsel's failure to include any lodestar information or supporting documentation with the Fees Motion deprived Class

members with sufficient due process. Although the Ninth Circuit encourages, but does not require, district courts to consider the lodestar cross-check when evaluating fee applications, the Ninth Circuit described in *In re Mercury* that fee motions must allow "class members an opportunity thoroughly to examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported." 618 F.3d at 994. Further, the Ninth Circuit explained that class members are not provided with sufficient due process if they are given only generalized information and are "furnished with no information of what that work was, how much time it consumed, and whether and how it contributed to the benefit of the class." *Id.* The Ninth Circuit reached these conclusions even though the counsel in *In re Mercury* requested a percentage-of-recovery fee award.

The Court directed Class Counsel to explain how the Fees Motion complied with *In re Mercury* when the motion contained *no* lodestar information—no information about hours worked, hourly rates, or any bases on which Class members could consider Class Counsel's charges and the type and volume of Class Counsel's work in considering whether to file an objection. Class Counsel responded that because it was seeking a percentage-of-the-recovery award, Class Counsel did not need to provide such information to the Class.[8] Class Counsel cited *Demmings v. KKW Trucking, Inc.* in support of Class Counsel's argument. 2018 WL 4495461 (D. Or. Sept. 19, 2018). In *Demmings*, however, counsel provided summary lodestar information with the original fee motion. Counsel did not provide *detailed* lodestar information, which counsel offered to provide at the final fairness hearing. The Court required additional detailing

---

[8] The Court notes that while Class Counsel may *request* percentage-of-the-recovery method, it is at the Court's discretion which method to apply in awarding attorney's fees. It is also at the Court's discretion which factors to consider, including the lodestar cross-check. Thus, Class Counsel should include lodestar information so that the Court may exercise its discretion without having to request a supplemental filing.

information regarding counsel's requested costs in a supplemental filing along with briefing on whether the initial summary lodestar information complied with *In re Mercury*. In awarding attorney's fees (in a lower amount than requested by counsel), the Court stated: "Plaintiff provided a summary of hours worked by each attorney. Thus Class Members had the opportunity to object that the hours worked either were inadequately documented or excessive." *Id.* at *12. The Court also expressly found that "[t]he information filed by Plaintiff before the objection deadline was sufficient for a lodestar cross check." *Id.* Unlike in *Demmings*, Class Counsel did not originally file sufficient information for a lodestar cross check or a summary of hours providing a baseline of information so that Class members could object that the hours worked were not sufficiently documented or were far outweighed by the amount requested in the percentage-of-recovery award.

Despite Class Counsel's failure to provide any lodestar information, Class Counsel filed the Fees Motion before the objection deadline and declared its intent to request 25 percent of the recovery in attorney's fees. Class members also received multiple notices of their right to object to attorney's fees. No Class member objected to Class Counsel's fee request, objected that the fee request was inadequately documented, or requested additional information about the fee request. Thus, although the Court finds that Class Counsel erred by failing to include *any* information about hours worked and hourly rates in its motion, under the circumstances of this case that error does not result in an unacceptable deprivation of due process rights for Class members or preclude the Court from considering the Fees Motion on the merits.

The Court exercises its discretion to use the percentage-of-recovery method in this case. While the Court finds that the settlement reached is fair, reasonable, and in the best interests of the C&C, Class Counsel has made significant, repeated errors throughout the settlement phase of

this case. These errors required an additional round of notice to the C&C and significantly

delayed approval of the settlement, and therefore payment of funds to the C&C. Initially, the

proposed settlement did not separate the Class and Collective and did not permit members of the

Collective to opt in, as required under the FLSA. This error required the parties to revise the

proposed settlement and resubmit it to the Court. The proposed notice procedure also had to be

corrected for failing to comply with *In re Mercury* and other insufficiencies.

After preliminary approval, the Notice was distributed to the Class with an incorrect date

for objections. The date given to the C&C was *before* the date that Class Counsel filed the

motion for attorney's fees, thereby violating the requirement of *In re Mercury* that the deadline

for objections be *after* the motion for attorney's fees is filed. Class Counsel apparently did not

discover this error at any point during the class period. Had it timely been addressed, a

supplemental notice could have been sent to the C&C before it would have caused any delay.

Additionally, Class Counsel was silent in the Settlement Motion regarding the requirements of *In

re Mercury*, despite the Court having specifically referenced this requirement in previously

denying preliminary approval. Class Counsel also represented in the Settlement Motion that Epiq

had followed the procedure established in the Court's Order granting preliminary approval. That

was inaccurate because Epiq did not follow the Court's order with respect to the date for

objections. Moreover, Class Counsel stated that the notice provided all required information,

including how to object to attorney's fees and the date by which to object, without informing the

Court that the date was incorrect and violated the standard of *In re Mercury*. That is not

acceptable conduct. The Court discovered the error by reviewing the attachments to the

declaration of the claims administrator.

The Court also found that the Settlement Motion had included only a cursory discussion to the signs of collusion that the Court must scrutinize, and made inaccurate statements about whether there were clear sailing and reversion provisions. Upon the Court's request, the parties submitted additional briefing, which for the first time acknowledged that there is a clear sailing provision and a reversion in the Settlement.

Additionally, as discussed above, the Fees Motion did not contain any information regarding counsel's hours worked or hourly rate. The Court had to order Class Counsel to file supplemental lodestar information, so that the Court could exercise its discretion to determine which fee method to apply, conduct a lodestar cross-check, and perform its role to "act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *In re Mercury*, 618 F.3d at 994 (quotation marks omitted). Even then, Class Counsel did not provide anything other than a very high level summary with 18 total block-billed entries. These entries include, for example, combining all incoming emails into one time entry, all outgoing emails into one time entry, and all "certification briefings" and "post-certification supplemental briefings" into one entry. Thus, the Court could not perform a cross-check after deducting the time Class Counsel spent on performing supplemental tasks required as a result of counsel's own errors. Although the Court generally does not perform a lodestar cross-check at the detailed level of a lodestar fee award, a cross-check cannot be completed without *some* review. The Court finds that, particularly under the circumstances of this case where significant additional work was required as a result of mistakes by Class Counsel, the combined summary of hours eventually submitted by Class Counsel was not helpful.

The Court further notes that Class Counsel had not engaged in a significant amount of litigation in this case. At the time of settlement, Lead Plaintiff had not filed a motion for class

certification. The parties litigated limited cross-motions for partial summary judgment and exchanged 53,000 pages of documents. They did not take any depositions. They took sufficient discovery to learn about the claims and make an informed decision about settlement, but the amount of litigation also supports a reduction from the 25% lodestar.

 Review of the traditional factors do not outweigh consideration of these special factors. Class Counsel achieved excellent results for the Class. There is no support that this case was particularly risky beyond a normal FLSA and Rule 23 hybrid case. The case appears to have resulted in a slight benefit in addition to the cash settlement. Class Counsel asserts that ABM agreed to change its payroll processes so that Oregon Workers' Benefit Fund assessments will no longer be deducted from employee wages for non-worked hours.[9] In considering the burdens, Class Counsel has paid approximately $10,000 in expenses, not counting the $3,000 in expenses required for re-noticing the Class. This case, however, has only been litigated for three years as of the time of settlement. It has not gone through class certification or appeal. This case is not analogous to the highly burdensome cases that had hundreds of thousands of dollars in expenses and were litigated for more than 10 years, requiring counsel to turn down other work, in which the burden factor was relevant. Counsel does not contend that he has had to turn down significant work to litigate this case. Finally, the case was handled on a contingency basis, and the Court considers that in awarding a percentage of the Settlement Fund instead of awarding fees based on the lodestar method, and in awarding a fee that includes a positive multiplier.

 In light of the special factors, departure from the 25% lodestar is appropriate, and a reduction in the fees requested by Class Counsel is warranted. Class Counsel did not demonstrate the necessary diligence and skill in the settlement phase of this case to justify an award

---

[9] This agreement is not part of the Settlement Agreement.

of $1,027,903.48, an amount which is 25% of the Settlement Fund. The Court finds that it is appropriate to reduce Class Counsel's requested fee award to 20% of the Settlement Fund. *See Schwartz v. Citibank (S. Dakota), N.A.*, 50 F. App'x 832, 836 (9th Cir. 2002) (affirming district court's reduction of requested 25% award to 20%); *In re classmates.com Consol. Litig.,* 2012 WL 3854501, at *7 (W.D. Wash. June 15, 2012) (reducing the requested fee award to 20% of the common fund); *accord Viszcaino*, 290 F.3d at 1047 (noting that 20-30 percent is a normal range for a common fund award); *Six (6) Mexican Workers*, 904 F.2d at 1311 (same). This results in a payment to Class Counsel of $822,322.79, or a reduction of $205,580.70 from the amount requested. The unawarded fees shall be distributed pro rata to Class members who did not submit a claim and did not opt out. When the revised fee award amount is compared to $1,938,467.24, the revised amount paid to the C&C ($1,732,886.54+$205,580.70), it is 42.42%. This fee appropriately compensates Class Counsel for the time and service provided to the Class.

Performing a lodestar cross-check also supports this reduced fee award. Class Counsel's lodestar is $258,543. This is somewhat inflated because it is includes work required due to Class Counsel's own errors, which the Court would eliminate even for a lodestar cross-check had Class Counsel provided sufficiently detailed time records. The awarded fees of $822,322.79 represent a 3.18 multiplier of Class Counsel's claimed lodestar amount, accepting Class Counsel's hourly rate of $505 per hour and his paralegal's rate of $205 per hour. Class Counsel's requested fee of $1,027,903.48 would represent a 3.98 multiplier. The mean multiplier in the Ninth Circuit from 2006-11 was 1.43. *See* 5 Newberg on Class Actions § 15.89 (5th Ed.). The mean multiplier for employee wage and benefits cases is 1.51. *Id.* "[M]ultipliers increase as fund size increases . . . . [T]he smallest funds tend to generate awards at or just below counsel's lodestar, while the mean in the largest cases was below 2.5 in one study and just above 3 in the other." *Id.* There are

"roughly 50 reported cases with multipliers over 3.5." *Id.* Thus, the multiplier in this case, even after the Court's deduction, is on the high end of multipliers awarded by courts.

The Settlement Agreement provides that "[i]n the event that the Court orders a Class Counsel's Fees award of less than the requested amount . . . that occurrence shall have no bearing on the validity or enforceability of this Settlement Agreement." ECF 77, Ex. 1 at 7. Thus, this decision does not affect the Settlement approval. *Accord In re Bluetooth*, 654 F.3d at 945 (acknowledging that when a settlement is not conditioned on the award of attorney's fees and costs or an incentive award, vacatur of a fee award does not invalidate the settlement's approval).

**E.  Incentive Award and Administrative Costs**

"Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit." *Radcliffe*, 715 F.3d 1157, 1163 (9th Cir. 2013). Although incentive awards are "fairly typical in class action cases," *Rodriguez*, 563 F.3d at 958, they should be scrutinized to ensure "that they do not undermine the adequacy of the class representatives," *Radcliffe*, 715 F.3d at 1163. Incentive agreements can undermine the adequacy of class representation, for example, when they are grossly disproportionate, when they incentivize class representatives to settle without considering whether trial might be more beneficial to the class, or when incentive awards are conditioned upon approving the settlement agreement. *Id*. at 1163-65. Thus, a court must look at incentive awards individually to see whether the plaintiff is protecting the interests of the class and whether the proposed incentive award undermines the plaintiff's representation of the class. "Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit against their former employers." *Bellinghausen.*, 306 F.R.D. at 267 (quoting *Rodriguez*, 563 F.3d at 958-59). They "typically range from $2,000 to $10,000." *Id.*

Lead Plaintiff requests an award of $10,000. Lead Plaintiff has pursued this case for the benefit of the class. Nothing in the Settlement Agreement or the proposed incentive award supports that the requested award undermines Lead Plaintiff's representation. The award, while somewhat high, is not grossly disproportionate to the settlement as a whole, or to the per-claimant recovery. Many claimants received upward of $4,000, with some claimants receiving more than $7,000, and one as much as $17,000. Class Counsel explained that Plaintiff spent time and effort meeting and speaking with Class Counsel throughout the litigation, reviewing pleadings and documents, participating in settlement discussion, and searching for and producing documents. The Court grants Lead Plaintiff's request for approval of a $10,000 incentive fee, to be paid to Lead Plaintiff from the Settlement Fund.

The parties ask the Court to approve the $50,000 in settlement administration costs already paid to Epiq. As detailed above, Epiq has administered a comprehensive notice process, twice over, and achieved high rate of contact with the Class. The Court grants the parties' motion and approves $50,000 in settlement administration expenses to be paid to Epiq from the Settlement Fund.

## CONCLUSION

The Settlement Motion, ECF 81, is GRANTED, and the Fees Motion, ECF 84, is GRANTED IN PART. The Court awards Lead Plaintiff $10,000 as an incentive award for service to the Class, Class Counsel $822,322.79 in fees, and the Claims Administrator $50,000 for settlement administration costs.

**IT IS SO ORDERED**.

DATED this 2nd day of September, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 42 – OPINION AND ORDER